UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HOUSING RIGHTS INITIATIVE,

Plaintiff,

v.

COMPASS, INC., et al.,

Defendants.

21-cv-2221 (SHS)

<u>OPINION & ORDER</u>

---

SIDNEY H. STEIN, U.S. District Judge.

| | | |
|---|---|---|
| I. | Background | 2 |
| | A. Housing Rights Initiative ("HRI") | 2 |
| | B. Housing Choice Voucher ("HCV") Program | 3 |
| | C. Impact of Alleged Widespread HCV Rejection on HRI's Mission | 4 |
| | D. Claims for Relief | 5 |
| II. | Defendants' Motions to Dismiss and Defendants' Motions for Judgment on the Pleadings | 7 |
| III. | Standing | 8 |
| | A. Legal Standard | 8 |
| |    1. Conduct that Frustrates an Organization's Ability to Carry Out its Mission | 10 |
| |    2. Diversion of Resources | 11 |
| |    3. Increased Demand for an Organization's Services | 13 |
| |    4. Impact of Connecticut Parents Union v. Russell-Tucker | 13 |
| | B. Analysis | 17 |
| |    1. Injury in Fact | 17 |
| |    2. HRI's Injuries are Traceable to the Challenged Conduct of Defendants | 23 |
| |    3. Redressability | 24 |
| IV. | Disparate Impact Claim under the Fair Housing Act | 25 |
| | A. Legal Standard | 25 |
| |    1. Fed. R. Civ. P. 12(b)(6) Standard | 25 |
| |    2. Parties Authorized to Sue Under the FHA | 26 |
| |    3. Entities Subject to the FHA | 27 |
| |    4. Disparate Impact Liability | 28 |
| |    5. Plaintiff's Burden on Disparate-Impact Test at the Pleading Stage | 33 |
| | B. Analysis | 35 |
| |    1. HRI is an Aggrieved Person Under the FHA | 35 |
| |    2. Defendants Are Subject to the FHA | 35 |
| |    3. Sufficiency of HRI's Disparate Impact Pleading | 35 |
| |    4. Individualized Pleading | 40 |
| V. | Supplemental Jurisdiction over Non-FHA Claims | 41 |
| VI. | Conclusion | 41 |
| | Appendix | 42 |

Plaintiff Housing Rights Initiative ("HRI") has brought this action against 77 defendants that are landlords and brokers of housing accommodations, or have the right to approve rental accommodations. Plaintiff subsequently filed an Amended Complaint.[1] HRI alleges that each defendant refuses to rent its housing units to prospective tenants who hold a federal Housing Choice Voucher ("HCV"), even though the prospective tenants can afford to pay the advertised rent for the units.

Eleven defendants have moved to dismiss the action, one defendant has moved for judgment on the pleadings, and two defendants have moved for both. These defendants allege, *inter alia*, that HRI lacks standing to sue under Fed. R. Civ. P. 12(b)(1) and that even if HRI has standing to bring this action, its federal claims—both brought under the Fair Housing Act ("FHA")—must be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, the motions to dismiss and the motions for judgment on the pleadings are denied.

## I. Background

### A. Housing Rights Initiative ("HRI")

HRI is a "national nonprofit housing watchdog group" that is "dedicated to promoting fair and lawful housing practices." Am. Compl. ¶4. From its inception "a core part of HRI's mission has been preserving affordable housing in New York City and assisting tenants in securing and maintaining access to affordably priced housing." *Id.*

HRI has historically pursued its mission "by counseling and organizing tenants in New York City about their rights to affordable housing and transparency by landlords, such as rights guaranteed by rent-stabilization laws, tax reporting requirements and other laws [and also] assists these tenants by referring them to legal counsel who advise and assist tenants to bring legal actions against landlords who seek to evade these affordable housing laws and reporting requirements." *Id.* Its efforts, according to the Amended Complaint, have "substantially increased the inventory of affordably-priced housing in the City." *Id.*

Starting in 2017, HRI "began hearing from community partners and attorneys at legal services organizations about the struggles that many individuals and families face in being unable to locate rental properties that would accept their vouchers, and that this problem had become an insurmountable barrier to safe and affordable housing for many members of the New York City community." Am. Compl. ¶106. In other words,

---

[1] The action was originally commenced against 88 defendants, but several defendants have since been voluntarily dismissed. The Amended Complaint names 77 separate defendants.

although "[s]ince its founding, a core part of HRI's mission has been preserving affordable housing in New York City and assisting tenants in securing and maintaining access to affordably priced housing," and HRI had "historically done this by counseling and organizing tenants in New York City about their rights to affordable housing and transparency by landlords, such as rights guaranteed by rent-stabilization laws, tax reporting requirements and other laws," *id.* ¶181, HRI came to learn that its ongoing activities were being impeded by the widespread refusal of landlords to accept HCV holders despite the fact that the HCV holders could demonstrably pay the asking rent. *See* Am. Compl. ¶82.

### B.  Housing Choice Voucher ("HCV") Program

The HCV Program, a successor to the Section 8 Rental Voucher or Rental Certificate Program, "is a federally funded housing subsidy program designed to allow low-income families to obtain safe, decent, and affordable housing." Am. Compl. ¶81. More than 127,500 households in New York City have an HCV voucher, *id.*, and the City's HCV program is administered by three separate entities—the New York City Housing Authority ("NYCHA"), New York City Housing Preservation and Development ("HPD"), and N.Y. State Homes and Community Renewal ("NYSHCR")—that each oversee an allotment of vouchers. *Id.*

Unlike historical governmental housing programs where public funding is provided to maintain a government-controlled public housing unit, "Housing Choice Vouchers are tenant-based subsidies that are not linked to any particular housing complex, building, or unit, but rather enable families with a Housing Choice Voucher to rent housing in the private market, at market rates, provided the rent does not exceed the Program's payment standards (i.e. limits on the monthly rent that are set by NYCHA, NYSHCR and HPD) . . . ." *See* Am. Compl. ¶82. Thus, the HCV Program "removes some of the barriers that would otherwise restrict low-income families from the opportunity to obtain rental housing outside of areas of concentrated poverty, allowing families to move to neighborhoods with rich access to public transportation, grocery stores, green spaces, well-performing schools, and cultural enrichment." *Id.* HRI also notes that "Housing Choice Vouchers are designed, among other things, to allow very low-income families to rent safe, decent, and affordable privately-owned housing. Vouchers are especially important in high-cost jurisdictions like New York City, where rent burdens on low-income families are particularly severe." *Id.* ¶83.

At the time HRI began learning about tenants' inability to use HCVs, landlords of most buildings (and their representatives) were already barred from turning away HCV holders: since 2008, New York City law has prohibited property owners with buildings of six or more units from refusing to rent to HCV holders or otherwise make

their units unavailable to HCV holders[2] and since April 12, 2019, New York State has banned landlords and their representatives from refusing to rent to HCV holders.[3]

## C.   Impact of Alleged Widespread HCV Rejection on HRI's Mission

HRI grew concerned that a widespread refusal of landlords to rent to HCV holders—even when state and local law proscribed such conduct—risked jeopardizing the efficacy of HRI's mission and its ongoing activities. For instance, if HRI had successfully fought to return a building to the rent stabilization program,[4] and as a consequence the landlord had to lower the asking rents to no more than an amount calculable under the New York Rent Stabilization Program[5] and under the HCV Program payment standard, a landlord's refusal to lease that rent-stabilized apartment to HCV holders would serve as an absolute barrier to a low-income individual renting that unit. Similarly, if HRI was unsure whether a landlord would discriminate against HCV holders, it would be more reticent about expending resources to return a building to rent stabilization compliance if the units would be affordable under the HCV payment standard, but unavailable to the HCV holder. Although a single landlord or broker's decision to bar HCV holders from leasing units would not "result in a substantial decrease in the inventory of safe and affordable housing available to low-income tenants," widespread refusal to rent to HCV tenants would have such an impact. *Id.* ¶172.

"As a result of this information" and aware of the impediments that HCV holders faced in documenting and vindicating their own rights,[6] "HRI began an

---

[2] N.Y.C. Local Law No. 10 for 2008 (March 26, 2008); *see also Short v. Manhattan Apartments, Inc.,* 916 F. Supp. 2d 375, 401 (S.D.N.Y. 2012). In 2021, New York City expanded the prohibition to most additional residential buildings. *See* N.Y.C. Local Law No. 119 for 2020 (Nov. 17, 2020).

[3] Lawful Source of Income Non–Discrimination Act of 2019, 2019 N.Y. Sess. Laws ch. 56 (McKinney).

[4] *See* Am. Compl. ¶187 ("For example, during 2020 and 2021, HRI had expected to organize and counsel a sufficient number of tenants such that at least 2,000 housing units across New York City would be returned to affordability as a result of HRI's efforts."). *See also* NYC Rent Guidelines Board, *Tax Abatements & Exemptions FAQ,* https://rentguidelinesboard.cityofnewyork.us/resources/faqs/tax-abatements-exemptions/ (last visited Sept. 12, 2022).

[5] If a unit is subject to the rent-stabilization law, maximum legal rent is determined by a formula. Listings for rent-stabilized apartments need not advertise that the unit is subject to rent stabilization, but they may. *See, e.g.,* Am. Compl. ¶138. Accordingly, a rental unit might be covered by the rent stabilization program even if a rental unit posting omits this fact.

[6] Am. Compl. ¶97 ("Voucher holders frequently do not have the means or the ability to investigate and report rejections. Participating in investigations can be time-consuming and exhausting for these low-income New Yorkers . . . . Many renters do not know their rights and are unaware they are being discriminated against.").

investigation of New York City rental housing to determine the existence and [] scope of discrimination against Housing Choice Voucher holders in New York City." *Id.* ¶106. "During these investigations, HRI conducted tests to inquire about the practices and policies of brokers and landlords throughout New York City." *Id.* ¶108. HRI pleads that it "was compelled to divert hundreds of hours of time and scarce financial resources to fully investigate and identify the extent of housing providers' unlawful source-of-income-discrimination practices through its testing program and to determine how to counteract them." *Id.* ¶184.

### D. Claims for Relief

Plaintiff make four claims against all defendants. Plaintiff's first claim, under a disparate-impact theory of liability, alleges that defendants' refusal to rent to HCV holders violates the FHA by having a discriminatory impact on disabled individuals. 42 U.S.C. § 3604(f)(1). Plaintiff pleads that:

(i) "About 28% of New York City residents [] live in Housing Choice Voucher households have a disability," while only "9.8% of New York City residents in non-Housing Choice Voucher households have a disability." Am. Compl. ¶88;

(ii) "A voucher-holder is 2.9 times more likely to be disabled than a non-voucher holder." *Id.* ¶163;

(iii) "A strong link exists between the Housing Choice Voucher population and the disabled population, such that a policy that adversely affects voucher holders will likewise have a significant disproportionate effect on New York City's disabled population." *Id.* ¶161;

(iv) "Defendants' policy of automatically denying housing to any person with a voucher . . . has a disparate impact on the basis of . . . disability." *Id.* ¶160;

(v) "By denying all New Yorkers with Housing Choice Vouchers the opportunity to apply for and obtain housing in their buildings, each Defendant's policy prevents 9.2% of New York City's disabled population from applying for or obtaining housing in Defendants' buildings, while preventing just 2.8% of New York City's non-disabled population from applying for or obtaining housing in their buildings." *Id.* ¶162;

(vi) "Disabled New York City residents are 3.3 times more likely than non-disabled New York City residents to be adversely affected by Defendants' policies." *Id.*; and

(vii) "As a result of widespread voucher discrimination, voucher holders must frequently accept subpar housing in segregated neighborhoods, or risk losing their voucher altogether," *Id.* ¶85.

Plaintiff's second claim, also under a disparate-impact theory of liability, alleges that defendants' refusal to rent to HCV holders violates the FHA by having a

discriminatory impact on African Americans and Hispanic Americans. 42 U.S.C. §
3604(a). In so arguing, Plaintiff pleads that:

(i) "[V]oucher-holders are much more likely to be Black or Hispanic than non-
voucher holders in New York. Some 35% of New York City's voucher-holders are
Black, and 47% are Hispanic, or a total of 82% of the City's voucher-holding
population is Black or Hispanic. By comparison, just 21% of New York City's
general, non-voucher population is Black, 29% New York City's, non-voucher
population is Hispanic, for a total of 50% of the general population is Black or
Hispanic." *Id.* ¶167;

(ii) "Voucher-holders are [] 1.6 times more likely to be Black or Hispanic than non-
voucher holders." *Id.* ¶167;

(iii) "Because there is a strong link between the Housing Choice Voucher
population and the Black and Hispanic population, a policy that adversely affects
voucher holders will likewise have a significant disproportionate effect on New
York City's Black and Hispanic population." *Id.* ¶166;

(iv) "Defendants' policy of automatically denying housing to any person with a
voucher . . . has a disparate impact on the basis of . . . race." *Id.* ¶160;

(v) "Defendants' ban on Housing Choice Vouchers, by denying all New Yorkers
with vouchers the opportunity to apply for and obtain housing in their buildings,
prevents 5.5% of all Black New York City residents from securing housing in
Defendants' buildings, and 5.5% of all Hispanic New York City residents from
securing housing, while only preventing 1.7% of white New Yorkers from obtaining
housing." *Id.* ¶166;

(vi) "Overall, Black and Hispanic New York City residents are 3.2 times more likely
than white New York City residents to be adversely affected by Defendant's
policy." *Id.* ¶166; and

(vii) "As a result of widespread voucher discrimination, voucher holders must
frequently accept subpar housing in segregated neighborhoods, or risk losing their
voucher altogether." *Id.* ¶85.

Plaintiff's third and fourth claims cover state and local law. Plaintiff's third claim
alleges that defendants' refusal to rent to HCV holders violates the New York State
prohibition on the denial or withholding of an apartment for rent due to a prospective
tenant's source of income. New York State Human Rights Law, New York State
Executive Law § 296 et seq. ("NYSHRL"). Finally, plaintiff's fourth claim alleges that
defendants' refusal to rent to HCV holders also violates New York City's prohibition on
the denial or withholding of an apartment for rent due to a prospective tenant's source
of income. New York City Human Rights Law, New York City Administrative Code §
8-502(a) et seq. ("NYCHRL").

Plaintiff seeks the following: first, a declaratory judgment that "Defendants' acts, policies, practices, and statements of willfully refusing to rent apartment units to Housing Choice Voucher holders" (i) has an unlawful discriminatory effect based on disability in violation of the FHA, (ii) has an unlawful discriminatory effect based on race and/or national origin in violation of the FHA, and (iii) constitutes source of income discrimination" in violation of the NYSHRL and the NYCHRL; second, permanent injunctive relief "including an order that Defendants abandon their policies or practices of refusing to rent to Housing Choice Voucher holders and instead accept tenants without regard to sources of income, and such remedial actions as are necessary to ameliorate Defendants' past illegal discriminatory conduct"; and third, an award of monetary damages, reasonable attorneys' fees and costs, and punitive damages. Am. Compl., at 62-63.

## II. Defendants' Motions to Dismiss and Defendants' Motions for Judgment on the Pleadings

Eleven defendants moved to dismiss this Action,[7] one defendant moved for judgment on the pleadings, and two defendants moved for both.[8] For a table of the motions and memoranda (including abbreviations used throughout this Opinion & Order), see the Appendix. Because a Fed. R. Civ. P. 12(c) motion for judgment on the pleadings is governed by the same standard as a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim, the Court reviews these several motions together. *See Altman v. J.C. Christiansen & Assocs.*, 786 F.3d 191, 193 (2d Cir. 2015); *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 313 (S.D.N.Y. 2008).

Most of these motions center on two arguments. First, defendants seek dismissal under Fed. R. Civ. P. 12(b)(1) by arguing that plaintiff lacks Article III standing.[9] Second, defendants seek dismissal under Fed. R. Civ. P. 12(b)(6) by arguing that plaintiff has insufficiently pleaded disparate impact.[10] Separately, 83rd Street Associates argues for dismissal based on lack of an agency relationship between that defendant and Jan Reynolds Real Estate that allegedly performed the complained-of-actions on behalf of 83rd Street Associates.[11] In addition, Saldo Properties seeks dismissal under Fed. R. Civ.

---

[7] ECF Nos. 305, 312, 401, 323, 329, 358, 368, 371 (joint motion by FirstService Reality NYC, Inc. and Tenth Manhattan Corp.), 548 (joint motion by JRL-NYC, LLC and East 34th Street, LLC).

[8] ECF Nos. 428, 573.

[9] *See* Voro Mem.; Corcoran Mem.; Saldo Mem.; Coney Island Mem; FirstService Mem.; and GIM Mem.

[10] *See* Voro Mem., ECF No. 365; Corcoran Mem., ECF No. 314; 931-955 Coney Island Avenue LLC, Mem., ECF No. 360; FirstService Mem., ECF No. 372.

[11] 83rd Street Mem.

P. 12(b)(6) by arguing that HRI's claims are not sufficiently individualized for each defendant.[12]

## III. Standing

As an initial matter, the Court must determine whether HRI has standing to pursue its claims against each defendant.

### A. Legal Standard

"'A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it,' such as when 'the plaintiff lacks constitutional standing to bring the action.'" *Connecticut Parents*, 8 F.4th at 172 (quoting *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 416-17 (2d Cir. 2015)).

"Organizations . . . may have standing in one of two ways: by establishing so-called 'associational' or 'representational' standing to sue on behalf of its members, or by establishing that it was directly injured as an organization." *Conn. Parents*, 8 F.4th at 172. (footnote omitted). Because HRI is not a membership organization, it is suing on behalf of itself. Thus, to allege Article III standing, HRI must plausibly show it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "'[A]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice'" to establish standing." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 401 (2d Cir. 2015) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

In *Havens Realty Corp. v. Coleman*, the U.S. Supreme Court held that the nonprofit HOME organization had organizational standing (and declined to engage in a representative standing inquiry) to challenge property owners alleged FHA violations. 455 U.S. 363, 379 (1982). "According to the complaint, HOME's membership was "multi-racial and include[d] approximately 600 individuals [and] [i]ts activities included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination." *Havens Realty Corp.*, 455 U.S. at 368 (internal citations and quotation marks omitted). HOME "asserted that the steering practices of Havens had frustrated the organization's counseling and referral services, with a consequent drain on resources." *Id.* at 369.

The Court proceeded to find that:

If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for

---

[12] Saldo Mem. 8-9.

low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests, see *Sierra Club v. Morton*, 405 U.S. [727, 739 (1972)]. That the alleged injury results from the organization's noneconomic interest in encouraging open housing does not effect the nature of the injury suffered, *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 263 (1977), and accordingly does not deprive the organization of standing.

*Havens Realty Corp.*, 455 U.S. at 379 & n.20. As noted by the Second Circuit in *Ragin v. Harry Macklowe Real Est. Co.*:

The [*Havens*] Court based its conclusion [of an actionable injury in fact] on the following allegation pleaded in the plaintiff's complaint: "Plaintiff . . . has been frustrated by defendants' racial steering practices in its efforts to [obtain] equal access to housing through counseling and other referral services. Plaintiff ... has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices."

6 F.3d 898, at 905 (2d Cir. 1993) (quoting *Havens Realty Corp.*, 455 U.S. at 379) (internal quotations included).

In *Ragin*, the Second Circuit likewise found organizational standing of the Open Housing Center ("OHC") to sue a property owner that allegedly discriminated in its housing advertising:

Here, the injury sustained by the OHC as a result of the defendants' advertisements was documented by the trial testimony of Ms. Phyllis Spiro, the deputy director of the OHC. Ms. Spiro testified that the services offered by the OHC included providing information at community seminars about how to fight housing discrimination. Spiro testified that she and her small staff devoted substantial blocks of time to investigating and attempting to remedy the defendants' advertisements. . . . The district court concluded that the OHC established that its "activities relating to 'identify[ing] and counteract[ing]' the Defendants' advertising practices detracted [sic] the attention of OHC staff members from their regular tasks at the OHC." 801 F.Supp. at 1233 (quoting *Havens Realty*, 455 U.S. at 379, 102 S.Ct. at 1124). We agree.

*Ragin*, 6 F.3d at 905.

The Second Circuit has taken a broad view of what constitutes a "perceptible impairment" of an organization's activities that can lead to a finding of injury in fact, recognizing that "only a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact.'" *Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 129 (2d Cir. 2020) (quoting *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011)).[13] As explained below, the Second Circuit has outlined several avenues for an organizational plaintiff to show Article III injury.

### 1. Conduct that Frustrates an Organization's Ability to Carry Out its Mission

A defendant's conduct that frustrates an organization's mission can, on its own, constitute an injury in fact for Article III standing when the organization devotes resources to combatting the conduct. "Following the Supreme Court's decision in *Havens*, courts in this Circuit have held that an organization has standing where the defendant's conduct interferes with or burdens the organization's ability to carry out its usual activities." *Ctr. for Food Safety v. Price*, No. 17-CV-3833 (VSB), 2018 WL 4356730, at *4 (S.D.N.Y. Sept. 12, 2018). In *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, the Second Circuit found that a defendant government's "enforcement [of an ordinance] will adversely impact [the Workplace organization's] ability to organize day laborers because the Ordinance will necessarily disperse and reduce the number of day laborers gathering in Oyster Bay." 868 F.3d 104, 110 (2d Cir. 2017). The Court further noted that:

> The record demonstrates that Workplace's activities include traveling to day laborer sites in Oyster Bay to speak with laborers and if the Ordinance achieves one of its principal objectives—disbursement of day laborers—Workplace will inevitably face increased difficulty in meeting with and organizing those laborers. We have held that an organization shows injury-in-fact where, as here, a "policy has impeded, and will continue to impede, the organization's ability to carry out [its] responsibilit[ies]."

*Centro de la Comunidad Hispana*, 868 F.3d at 110 (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012)) (internal citations omitted).[14] *See also N.Y. Civil Liberties Union*, 684 F.3d at 295 ("The NYCLU has alleged an interest in

---

[13] *Moya* is cited by *Connecticut Parents Union v. Russell-Tucker* for the proposition that "[w]e have made clear that an organization may suffer the requisite injury when it 'diverts its resources away from its [other] current activities,' or otherwise incurs 'some perceptible opportunity cost.'" 8 F.4th 167, 173 (2d Cir. 2021) (quoting *Moya*, 975 F.3d at 129-30).

[14] Notably, *Connecticut Parents Union v. Russell-Tucker* states that its own "analysis of organizational injury coheres with our decision in *Centro de la Comunidad Hispana de Locust Valley*." 8 F.4th 167, 174 (2d Cir. 2021).

open access to TAB hearings as a matter of professional responsibility to clients. In order to represent clients before the TAB, NYCLU must prepare, in part, by observing TAB hearings. The NYCLU has shown that the access policy has impeded, and will continue to impede, the organization's ability to carry out this aforementioned responsibility.").

Notably, the Second Circuit in *Moya* reiterated that frustration of an organization's mission need not require that a defendant's conduct *halt* a plaintiff organization's programmatic work; a defendant's act that reduces the efficiency or success of the organization's activities can be adequate. 975 F.3d 120, 130 (2d Cir. 2020) ("[W]e have previously held that a plaintiff needs to allege only 'some perceptible opportunity cost' from the "expenditure of resources that could be spent on other activities.") (quoting *Nnebe*, 644 F.3d at 157); *Moya*, 975 F.3d at 130 ("[S]ubstantial expenditure of resources and frustration of an organization's mission are sufficient under our precedents to establish injury in fact.").

### 2. *Diversion of Resources*

The Second Circuit has also independently found injury where an organization has averred that it needed to divert resources from other activities to address the harm caused by a defendant's conduct. A diversion of resources injury-in-fact requires two elements: (i) the plaintiff organization determines that challenging or addressing the defendant's conduct is reasonably tied to the organization's ability to fulfill its mission or carry out pre-existing activities, and (ii) the plaintiff organization diverts resources away from *specific* other initiatives in order to challenge or otherwise address the defendant's conduct.[15]

In *Moya*, for instance, the Second Circuit affirmed the district court's finding of a "perceptible impairment" of an organization's "ability to help immigrants" that is sufficiently "concrete and particularized," because defendant's allegedly unlawful conduct required one of plaintiff's staff members to, "at a minimum, [spend] twice as much time servicing clients who require N-648 disability waiver requests, *leaving less time for YMPJ's other clients.*" 975 F.3d at 129–30. (internal quotation marks and citation marks omitted) (emphasis added).

*Moya*, to which *Connecticut Parents* approvingly cites, sheds light on three important aspects of a diversion-of-resources standing argument. First, the presence of a diversion-of-resources injury does not require a court to delve into the organization's internal decision-making process over how it allocates limited resources. The *Moya*

---

[15] *See Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021) ("CCDL fails to identify any 'current activities' from which it diverted resources in order to pursue those efforts, and it therefore fails to show 'that it was perceptibly impaired.'") (quoting *Centro de la Comunidad Hispana de Locust Valley*, 868 F.3d at 111).

court never inquired about why the plaintiff organization decided to increase staff time devoted to clients who needed N-648 disability waiver requests to the detriment of its other clients rather than choose to serve fewer clients needing N-648 disability waiver requests.

Second, the *Moya* panel, in accepting an injury-in-fact argument based on a diversion of resources toward one activity (i.e., serving clients requiring N-648 disability waiver requests) and away from others (i.e., "other clients"), did not require that the activity to which resources were diverted away from cease operating or that the activity to which resources were diverted towards be outside the scope of defendant's "current activities." Thus, when a defendant's conduct leads an organization to devote more-than-anticipated resources to address one or more of its goals or activities (that have been perceptibly impaired due to a defendant's conduct), and the organization pleads that it has devoted *fewer* resources to other goals, the organization has adequately pleaded injury. In other words, when an organization has previously been engaged in two types of activities, *e.g.*, X and Y, and defendant's conduct leads the organizational entity to increase its resource expenditure on activity X, and resultingly decrease its expenditure on activity Y, the organization has adequately established a diversion-of-resources injury.

Third, an organization's total expenditures need not increase because of the diversion of resources. *Connecticut Parents*, after citing *Moya*, notes that "[i]t follows that expenditures may satisfy the injury prong even if there is no increase in the organization's *total* expenditures." 8 F.4th at 173.

Other Second Circuit decisions instruct that an organization's diversion of resources need not require a wholesale shift of resources *away* from an organization's pre-existing activities. In *Nnebe v. Daus*, for instance, the Second Circuit held that "[e]ven if only a few suspended drivers are counseled by [plaintiff] in a year, there is some perceptible opportunity cost expended by the [plaintiff], because the expenditure of resources that could be spent on other activities 'constitutes far more than simply a setback to [NYTWA's] abstract social interests.'" 644 F.3d 147, 157 (2d Cir. 2011) (quoting *Havens Realty Corp.*, 455 U.S. at 379).

*Nnebe* and *Moya* are not aberrations in holding that diversion of resources toward one activity and away from another activity (even if that secondary activity continues with fewer resources) is adequate to demonstrate injury in fact. *See, e.g., Mental Disability L. Clinic, Touro L. Ctr. v. Hogan*, 519 F. App'x 714, 717 (2d Cir. 2013) (summary order) (affirming that a "[c]linic director's affidavit stating that the Clinic has diverted resources from education and training in order to contest the [challenged] practice at issue in this case" was sufficient for granting a clinic organizational standing against a defendant); *Fair Hous. Just. Ctr., Inc. v. Silver Beach Gardens Corp.*, No. 10 CIV. 912 RPP, 2010 WL 3341907, at *7 (S.D.N.Y. Aug. 13, 2010) ("Plaintiff sufficiently alleges an injury

in fact. Plaintiff alleges that it has suffered injury in the form of a diversion of its resources and frustration of its mission, including staff time expended to respond to Defendants' discriminatory conduct. The diversion of Plaintiff's resources and frustration of Plaintiff's mission is the type of injury held to be sufficient by the Supreme Court and the Second Circuit to demonstrate the injury in fact element of organizational standing.") (internal quotation marks and citations omitted).

### 3.   *Increased Demand for an Organization's Services*

The Second Circuit has also found injury in fact where a defendant's conduct plausibly increases demand for an organization's services. *See N.Y.S. Citizens' Coalition for Children v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019) ("The Coalition asserts that the State's alleged violations of the Act has cost it hundreds of hours in the form of phone calls from aggrieved foster families. The district court found, and we agree, that the Coalition has spent nontrivial resources fielding these calls, and that it will continue to have to do so absent relief. This showing is sufficient to establish that the Coalition has suffered its own injury."); *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 60–61 (2d Cir. 2020) (finding injury in fact where "[o]rganizations allege injury on the grounds that the Rule has necessitated significant and costly changes in their programmatic work and caused increased demand on their social service programs," where, for instance, the "African Services Committee is funding a campaign of radio-based public service announcements to disseminate information about the Rule and has documented an increased demand on its social service programs, as clients turn away from public benefits programs"). *Connecticut Parents*, in positively referencing these two decisions, notes that the Second Circuit "[has] recognized that a cognizable injury may arise via a burden that is imposed on an organization when there is an increased demand for an organization's services." 8 F.4th at 174.

### 4.   *Impact of Connecticut Parents Union v. Russell-Tucker*

Several defendants contend that *Connecticut Parents Union v. Russell-Tucker* has reshaped the landscape of organizational standing in the Second Circuit.[16] This Court disagrees and finds that *Connecticut Parents* in no way overruled *Havens Realty* or its progeny.[17]

---

[16] For example, FirstService avers that "[i]n order to establish 'perceptible impairment', a plaintiff must show an '*involuntary* material burden on its established core activities.'" FirstService Mem. 7 (quoting *Connecticut Parents Union*, 8 F.4th 173.).

[17] *Connecticut Parents* approvingly cites to *Havens Realty* in three instances. *See* 8 F.4th at 173 nn.20, 25, 175 n.25. As explained by the plaintiff:

> Defendants' reading of Connecticut Parents would turn decades of fair housing caselaw on its head, even though the Second Circuit in Connecticut Parents made clear it was only

The Connecticut Parents Union ("CTPU")[18] claimed that "its work was perceptibly impaired because it expended resources to counteract illegal activity touching on its core mission and in so doing diverted resources away from other activities," but the Second Circuit found no such injury. 8 F.4th 167, 173 (2d Cir. 2021) (internal quotation marks and footnote omitted). First, the court noted that "CTPU speaks loosely of its expenditures to counteract activity—that is, the 2017 RIS—touching on its core mission, but fails to identify any restrictions on its ability to perform the core activities—such as meetings, lectures, and general organizing—by which it pursued its mission prior to the 2017 RIS." *Connecticut Parents Union v. Russell-Tucker*, 8 F.4th 167, 175 (2d Cir. 2021) (internal quotations marks and footnote omitted). Second, the panel also found that *if* a plaintiff argues for injury in fact on grounds of an increased demand for its services, the plaintiff must plead that "any resulting costs were *material*," and that CTPU had not met this burden. *Id.* at 175.[19] Last, the panel determined that CTPU "initiate[d] a campaign against the 2017 RIS to advance its own 'abstract social interests,'" *Id.* (citing *Havens Realty*, 455 U.S. at 379), and that as a result, "any costs CTPU incurred from this campaign were not *involuntary*." *Connecticut Parents Union*, 8 F.4th at 175 & n.35. In rendering its final observation, the panel "rejected such an expansive concept of organizational injury for standing purposes" under which "CTPU would be able to successfully plead an injury simply by pointing to any Connecticut

---

reinforcing prior holdings, not trying to develop a new body of law. . . . *Connecticut Parents* makes no reference to organizational standing under the Fair Housing Act and neither explicitly nor implicitly overrules longstanding Supreme Court and Second Circuit jurisprudence regarding such organizational standing. Defendants' argument would constitute a landmark overhaul of the deep body of precedent recognizing organizational standing when a fair housing organization has diverted resources to combat unlawful practices after uncovering discrimination through civil rights testing.

Opp'n to Defs.' Mots. to Dismiss 16-17.

[18] *Connecticut Parents Union v. Russell-Tucker*, 8 F.4th 167, 170–71 (2d Cir. 2021) ("CTPU is a nonprofit advocacy group founded in 2011 to ensure that parents, guardians, and families are connected with the educational resources and support system necessary to protect their children's educational rights thus ensuring that neither race, zip-code, nor socio-economic status is a predictor of a child's success.") (internal quotation marks omitted).

[19] *Connecticut Parents Union*, 8 F.4th at 175 n.34.

We note that the record suggests that CTPU's counseling activities, at least prior to the 2017 RIS, were incidental and occasional, not "core." *See* Hearing Tr. 31:11-16 (CTPU App'x at 56) ("So we're not counselors, per se. We consult with attorneys, constitutional attorneys, people that are educators. So we consult with other experts that can help the parent . . . ."). For example, before the District Court, the CTPU President, Ms. Samuel, said she fielded "maybe about 15" telephone calls regarding the 2017 RIS quotas. Hearing Tr. 31:4-5 (CTPU App'x at 56). Such a number of calls falls far short of, for example, the "hundreds of hours" of phone calls found sufficient to show injury in comparable cases.

*Id.*

law relating to education that it makes a significant effort to oppose." *Id.* at 173. This concern underscores the pre-existing concern in this Circuit about permitting near limitless challenges to governmental decision making.[20]

To recap, the *Connecticut Parents* holding arguably increases an organizational plaintiff's burden in showing Article III injury in fact when challenging a government law or regulation in two respects. First, regarding an injury-in-fact argument premised on "divert[ing] its resources away from its [other] current activities," *Connecticut Parents* holds that "the challenged law or regulation must impose a cost (*e.g.*, in time, money, or danger) that adversely affects one of the activities the organization regularly conducted (prior to the challenged act) in pursuit of its organizational mission." 8 F.4th at 173-4. Second, regarding a plaintiff's increased-demand-for-services argument, *Connecticut Parents* required that if a plaintiff argues for injury in fact on grounds of an increased demand for its services, the plaintiff must sufficiently plead that "any resulting costs were *material*." 8 F.4th at 175. Notably, plaintiffs in *Connecticut Parents* did not argue for standing on frustration-of-organizational-mission grounds.

      a.   *Any Heightened Injury-In-Fact Burden for Organizations Limited to Organization's Challenge to Governmental Law or Regulation*

The Court first notes that *Connecticut Parents'* holding is expressly limited to cases in which an organization challenges a law or regulation. *Id.* at 173. The *Connecticut Parents* panel restates its holding as: "the challenged law or regulation must impose a cost (*e.g.*, in time, money, or danger) that adversely affects one of the activities the organization regularly conducted (prior to the challenged act) in pursuit of its organizational mission." 8 F.4th at 173-74. Thus, any heightened pleading standard from *Connecticut Parents* is not controlling because the case is expressly limited to organizational plaintiff challenges to a new law or regulation and the case does not directly or impliedly overrule *Havens* or its progeny.

      b.   *The Merits of Applying a Heightened Injury-in-Fact Pleading Burden to Organizational Plaintiffs Suing Private Entities under the FHA*

The Court considers, and rejects, defendants' contentions that it should apply a heightened *Connecticut Parents* pleading standard to an organization challenging a private defendant's allegedly unlawful conduct.

---

[20] *See Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021) ("An organization may nonetheless bring 'a § 1983 suit on its *own* behalf so long as it can independently satisfy the requirements of Article III standing.'") (quoting *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011)); *Conn. Citizens Def. League*, 6 F.4th at 447 ("'[A]n organization's abstract concern with a subject that could be affected by an *adjudication*' is insufficient.") (quoting *Ragin v. Harry Macklowe Real Est. Co.*, 6 F.3d 898, 905 (2d Cir. 1993)) (emphasis added).

As noted by the Second Circuit, "[i]n those instances in which Congress expressly grants a private right of action to a class of persons to enforce a federal right, those persons have standing to sue in federal court so long as they satisfy the case or controversy requirement of Article III, *viz.*, alleging 'that [they] personally [have] suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" *Ragin v. Harry Macklowe Real Est. Co.*, 6 F.3d 898, 903 (2d Cir. 1993). Moreover, as explained in *Ragin*, the FHA contains a "private attorney general provision" that constrains the ability of courts to limit standing beyond the broad contours of Article III.[21]

Under defendants' suggestion—that the Court must apply the *Connecticut Parents* holding such that the challenged "law or regulation" becomes the *defendants' conduct in refusing to service HCV holders*—the defendants reading would logically prohibit *any* FHA relief where an organization has identified an ongoing violation, but cannot, absent discovery, determine the precise commencement of the allegedly unlawful conduct.

For at least two reasons, courts could reasonably impose this heightened injury-in-fact pleading standard on organizational plaintiffs challenging government conduct, but not on an organizational plaintiff challenging a private defendant's FHA violation.

First, the government's actions are public and an organizational plaintiff has an opportunity to obtain factual materials through freedom of information requests prior to the filing of a complaint. By contrast, a private defendant has no such obligation to publicize or disclose its potentially unlawful conduct prior to the commencement of a suit.

Second, courts understandably impose a more exacting standing requirement for an organization's challenge to a generally applicable law or regulation than for an organization's suit against a private party. In the context of challenges to federal executive or legislative actions, the Supreme Court has held that "[o]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (internal citations omitted). Courts throughout the country have recognized that standing inquiries are likewise more rigorous when plaintiffs challenge state or local government actions than when challenging a private party's allegedly wrongful

---

[21] *Ragin*, 6 F.3d at 904 ("There is no significant difference between the statutorily recognized injury suffered by the tester in *Havens Realty* and the injury suffered by the Ragins and the Cuylers, who were confronted by advertisements indicating a preference based on race. *See Saunders v. General Servs. Corp.*, 659 F.Supp. 1042, 1053 (E.D. Va.1987). Given the private attorney general provision in section 813(a) of the Act and the Supreme Court's holding in *Havens Realty*, the district court was constrained to find that the individual plaintiffs had standing to bring this action in federal court.").

conduct. *See, e.g., Sever v. City of Salem*, 390 F. Supp. 3d 299, 307 (D. Mass. 2019); *Ali v. Hogan*, 496 F. Supp. 3d 917, 927 (D. Md. 2020), *aff'd as modified*, 26 F.4th 587 (4th Cir. 2022); and *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, No. EDCV1300883JGBSPX, 2019 WL 2610965, at *7 (C.D. Cal. Apr. 19, 2019).

Accordingly, to the extent that *Connecticut Parents* heightened the injury-in-fact requirements for organizational plaintiffs who sue governmental defendants beyond the standard established under existing Second Circuit law, any heightened injury-in-fact requirement is inapplicable to an organizational plaintiff suing a private defendant under the FHA.

## B. Analysis

"Because standing is challenged [here] on the basis of the pleadings, we accept as true all material allegations of the complaint, and must construe the complaint in favor of [Plaintiff]." *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 227–28 (2d Cir. 2011), *aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 133 S. Ct. 2321, 186 L. Ed. 2d 398 (2013) (quoting *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008)). Moreover, "[a]t the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 401-02 (2d Cir. 2015) (quoting *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003)).

Of the three standing requirements, movants principally argue that HRI has not established an injury.[22]

### 1. *Injury in Fact*

HRI avers that its "injury falls squarely within the type of injury on which standing was based in *Havens* and its progeny." Opp'n to Defs.' Mots. to Dismiss 2. In the Amended Complaint, HRI claims injury on grounds that defendants' conduct (i)

---

[22] *See* Voro Mem. 4; Corcoran Mem. at 10; 931-955 Coney Island Ave. Mem. 8; FirstService Realty & Tenth Manhattan Mem. 5-10. Several defendants claim that HRI is akin to the plaintiff in *Connecticut Parents Union v. Russell-Tucker*, 8 F.4th 167, 174 (2d Cir. 2021), which the Second Circuit found lacked standing to challenge a governmental policy. *See e.g.*, Voro Mem. 3. Defendants suggest that HRI, like the Connecticut Parents, "decided to initiate a campaign . . . to advance its own 'abstract social interests'" and that "expenditures or other activities, if incurred at the organization's own initiative, cannot support a finding of injury." Voro Mem. at 3 (citing *Connecticut Parents*, 8 F.4th at 174). *See also* Corcoran Mem. 8 ("As an organization, Plaintiff must prove that it was injured by alleging the defendant's conduct 'did not merely harm its abstract social interests but perceptibly impaired its activities.'") (quoting *Conn. Parents*, 8 F.4th at 174).

has, does, and will continue to frustrate HRI's mission,[23] (ii) has compelled HRI to divert its resources away from pre-existing HRI activities to address defendants' conduct,[24] and (iii) has led to an increase in demand for HRI's services.[25] HRI does not claim it is directly injured by defendants' contribution to racial and economic segregation. Although the Court finds that HRI does not show an injury on grounds of an increased demand for resources, HRI does establish injury on grounds of frustration of organizational mission and a diversion of resources.

### a. Frustration of Organizational Mission

HRI has sufficiently pleaded that it has sustained an injury because defendants' policies barring use of HCVs frustrates HRI's organizational goals. Despite HRI's alleged success in having "substantially increased the inventory of affordably-priced housing in the City," Am. Compl. ¶4, thousands of these units were "off limits to low-income tenants with vouchers." *Id.* ¶183. Moreover, gains in the stock of affordably priced housing "have been jeopardized and offset by the epidemic of source of income discrimination uncovered by HRI's investigation, which has effectively placed thousands of affordable units effectively off limits to voucher-holding tenants." *Id.*

Contrary to the suggestion of defendants, *see, e.g.,* FirstService Mem. 9, a plaintiff organization need not plead that "Defendants' alleged acts have compelled Plaintiff to pursue this action in order to continue to exist as an organization." Material interference with an organization's ability to pursue its goals is adequate. Courts routinely recognize that a complained-of conduct that impairs a nonprofit organization's ability to reach its

---

[23] "Defendants' wrongdoing has injured, injures, and—if left unaddressed—will continue to injure HRI by frustrating its mission to promote fair housing opportunities and preserve and maintain affordable housing in New York City, and will require HRI to continue to divert its efforts and programming to combat practices that deny housing opportunities to voucher holders, preventing HRI from continuing its other counseling, organizing and referral efforts on behalf of tenants." Am. Compl. ¶190.

[24] Am Compl. ¶187 ("Defendants' discriminatory policies and practices have diverted HRI's resources away from its organizing, counseling and referral services in order to address the rampant source of income discrimination that is epidemic in New York City."); *Id.* ¶184 ("Due to defendants' conduct, "HRI was compelled to divert hundreds of hours of time and scarce financial resources to fully investigate and identify the extent of housing providers' unlawful source-of-income-discrimination practices through its testing program and to determine how to counteract them."); *Id.* ¶186. ("In response to HRI's investigation, HRI was compelled to divert hundreds of hours of resources to an extensive education and outreach campaign to the affected communities in an effort to combat Defendants' discrimination. . . . Not including the time spent investigating using testers, HRI's staff expended more than 240 hours on education and outreach.").

[25] Am. Compl. ¶191 ("Defendants' discriminatory policies and practices have had the effect of reducing the available inventory of safe and affordable housing around the City, leading to an increased demand and need for HRI's organizing, counseling and referral services.").

goal—or makes the activities less efficient or less successful—constitutes an injury. *See supra* Section III.A.1.

Corcoran argues that HRI's goal to have "2,000 housing units across New York City . . . returned to affordability as a result of HRI's efforts" is "arbitrary" merely because HRI "does not allege . . . [i] how this goal would actually be reached, [ii] why missing this goal injures HRI in any way, or [iii] why their investigation does not contribute to this goal." Corcoran Mem. 6. Corcoran adds that "following Plaintiff's logic, [HRI] could arbitrarily pick any number of housing units and claim to have missed their goal in an attempt to manufacture standing." *Id*. Corcoran also suggests that an organization can never establish injury when an organization has devoted resources to achieving a goal and a defendant's conduct is the but-for cause of the organization's inability to reach its goal. *See Id.*

Defendants' arguments are unconvincing. For purposes of the motion to dismiss, the Court accepts plaintiffs' representations as true—that in this case, "the goal of 2,000 units across New York City would be returned to affordability" and the Court has no burden to further interrogate how the organization decided on this goal.

Second, as explained in the above discussion of *Centro de la Comunidad Hispana de Locust Valley*, a defendant's impairment of an organization's mission can itself constitute injury for standing purposes.

Third, HRI explains how its investigation into property owner and broker non-compliance with New York source-of-income discrimination laws does not on its own increase the available supply of housing units to low-income New Yorkers. If owners and brokers were in full compliance with New York City and New York State's prohibition on source-of-income discrimination, HRI's investigation into source-of-income discrimination would not have helped HRI return any units to affordability. HRI does effectively plead, however, that (i) "HRI began hearing from community partners and attorneys at legal services organizations about the struggles that many individuals and families face in being unable to locate rental properties that would accept their vouchers, and that this problem had become an insurmountable barrier to safe and affordable housing for many members of the New York City community" and that (ii) "[a]s a result of this information, HRI began an investigation of New York City rental housing to determine the existence and of scope of discrimination against Housing Choice Voucher holders in New York City." Am. Compl. ¶106. Only with such information could HRI determine how best to remove any such discriminatory impediment (if HRI found it indeed existed) to its goal of connecting low-income New Yorkers to affordable housing. Thus, the investigation into allegedly discriminatory conduct does not by itself help HRI achieve its concrete goal of 2,000 housing units.

b. *Diversion of Resources*

Plaintiff adequately alleges that defendants' discrimination forced HRI to divert its resources to combat the source-of-income discrimination. Resources were diverted towards both (i) conducting the investigation into defendants' source-of-income discrimination that cost HRI "hundreds of hours"[26] and (ii) expending more than 240 hours on education and outreach "in an effort to combat Defendants' discrimination,"[27] and "away from its organizing, counseling and referral services"[28] designed to "increase[] the inventory of affordably-priced housing in the City."[29]

    i.   Expenditure of Resources Toward Combatting Source-of-Income Discrimination

First, defendants suggest that HRI did not in fact spend resources to address defendants' conduct.[30] This argument fails because it ignores the 240 hours HRI devoted to source-of-income education and outreach—beyond the scope of its normal activities—and mischaracterizes HRI's hundreds of hours spent on the investigation work as consisting of effortless one-off phone calls. Accordingly, HRI has adequately pled an expenditure of staff time and resources. *See L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 397 (S.D.N.Y. 2013) ("FHJC has alleged that it 'expended staff time and other resources to investigate and respond to Defendants' discriminatory rental practices, which diverted resources away from other FHJC activities.' This allegation is sufficient to plead injury-in-fact and thus organizational standing.").

Contrary to the assertions of defendants, this action brought by HRI against multiple defendants is outside the scope of HRI's standard activity of "assist[ing] these tenants by referring them to legal counsel who advise and assist tenants to bring legal actions against landlords who seek to evade these affordable housing laws and

---

[26] *Id.* ¶184 (pleading that HRI spent "hundreds of hours of time and scares financial resources to fully investigate and identify the extent of housing providers' unlawful source-of-income-discrimination practices through its testing program and to determine how to counteract them").

[27] *Id.* ¶186.

[28] Am. Compl. ¶187.

[29] *Id.* ¶4. *See also Id.* ¶182 ("Through HRI's counseling, organizing and referral efforts, it has successfully and substantially increased the inventory of affordably-priced housing in the City when the tenants who it counsels and organizes are able to secure agreements with landlords around the City ensuring that units will be affordably priced.").

[30] Corcoran contends that HRI never diverted resources to combat source-of-income discrimination. The defendant claims that "making one phone call to Corcoran cannot be enough to satisfy Plaintiff's burden to state it 'diverted resources' away from its mission, particularly when Plaintiff admits it regularly employs testers to assist with its investigations." Corcoran Mem. 16. Coney Island makes the same argument. Coney Island Mem. at 11 ("[T]he mere making one phone call to Coney Island LLC cannot be enough to satisfy HRI's burden to state it "diverted resources" away from its mission . . .").

reporting requirements." Am. Compl. ¶4. The FHA is an anti-discrimination law, not an affordable housing law nor a reporting requirements law. The HCV program is an affordable housing law, but HRI does not seek any relief pursuant to that law.

HRI's Amended Complaint explains that the diversion of resources included not merely the investigation into potential source-of-income discrimination, but also education and outreach programs that diverted HRI from focusing on its standard activities seeking to "to preserve and maintain affordable housing, including its counseling, organizing and referral of tenants who have been overcharged and subject to other fraudulent practices by their landlords that have resulted in unaffordable housing." Am. Compl. ¶188.

    ii.  Expenditure of Resources Drew Resources Away from Other Activities

Contrary to defendants' arguments, HRI adequately explains how its expenditure of resources to combat source-of-income discrimination diverted resources away from HRI's other activities.

Corcoran claims that HRI's expenditure of resources on its investigation occurred "because such issues touched its mission of counseling and educating individuals on their rights as tenants," Corcoran Mem. 12, but its argument is unpersuasive. HRI's mission is not to engage in counseling and educating tenants in the abstract. Rather, its mission centers on "preserving affordable housing in New York City and assisting tenants in securing and maintaining access to affordably priced housing." Am. Compl. ¶4. As plaintiff explains in its opposition memorandum, "HRI's regular activities include organizing counseling, and referring tenants to preserve affordable housing. They do not include extensive outreach to community members, stakeholders, and landlords (including Defendants) about source of income discrimination." Opp'n to Defs.' Mots. to Dismiss 17.

Separately, defendant Voro argues that "where an organization 'fails to identify any current activities from which it diverted resources in order to pursue those efforts ... it therefore fails to show that it was perceptibly impaired.'" Voro Mem. 3 (quoting *Conn. Citizens Def. League*, 6 F.4th at 447). Yet here, and in contrast to *Connecticut Citizens Defense League*, the Amended Complaint *shows* current activities from which it diverted its resources:

       If HRI had not been required to divert such resources to address Defendants' discrimination, HRI would have used those resources to further its efforts to preserve and maintain affordable housing, including its counseling, organizing and referral of tenants who have been overcharged and subject to other fraudulent practices by their landlords that have resulted in unaffordable housing. This diversion has reduced the

impact of HRI's affordable housing advocacy, as well as adversely
impacted HRI's ability to engage in its other programmatic activities.

Am. Compl. ¶188. This diversion of resources away from other organizational activities
is precisely the kind of diversion adequate to show injury. *See supra* Section III.A.2.

For instance, combatting real estate owners' and brokers' source-of-income
discrimination is wholly distinct from HRI's "current activities" focused on efforts to
preserve and maintain housing and to help tenants subject to an overcharge or other
allegedly fraudulent practices by a tenant's current landlord. As set forth above, *see
supra* Section III.A.2, HRI need not claim that its diversion of resources led to a stoppage
of HRI's other activities.

Similarly, HRI's present position as a plaintiff suing multiple defendants is a
wholly distinct activity from HRI's practice of referring tenants to legal counsel for
participation in a class action.

> iii. HRI's Source-of-Income Activities Were Reasonably Necessary for
> it to Effectuate its Organizational Goals

HRI sufficiently pleads that it diverted resources in such a manner as necessary
for it to continue its established core activities in an effective manner. Plaintiff explains
in its Amended Complaint that, had it ignored defendants' alleged source of income
discrimination, HRI's goals of increasing the stock of affordable housing and placing
low-income tenants in affordable units would have been stymied:

> [D]uring 2020 and 2021, HRI had expected to organize and counsel a
> sufficient number of tenants such that at least 2,000 housing units across
> New York City would be returned to affordability as a result of HRI's
> efforts. Instead, HRI was forced to spend resources combatting Defendants'
> source of income discrimination, causing HRI to fall approximately 50%
> short of its goal.
>
> . . .
>
> If HRI did not engage in activities to combat Defendants' source-of-income-
> discrimination policies and practices, HRI's successes in maintaining and
> preserving affordable housing in New York City would be rolled back, due
> to the resulting reduced inventory of affordable housing available to low-
> income residents of New York City caused by Defendants' source-of-
> income discrimination.

Am. Compl. ¶¶187, 189.

Because HRI adequately pleads that defendants' source-of-income discrimination
directly interfered with its ability to achieve its affordable housing goals, HRI's
diversion of resources to address source-of-income discrimination was not HRI

pursuing an "abstract social interest." *See Havens Realty*, 455 U.S. at 379. Unlike the plaintiff in *Connecticut Parents*, HRI has explained how defendants' actions impede HRI's ability to perform its core activity of connecting low-income tenants to affordable housing. *Cf. Conn. Parents*, 8 F.4th at 175.

As explained above, HRI need not prove that it was "compelled" to divert resources to address defendants' source-of-income discrimination. HRI's decision to divert resources to address defendants' actions are not "categorically new activities" but rather was "reasonably necessary to continue an established core activity of the organization bringing suit." *Conn. Parents*, 8 F.4th at 174.

### c.  *Increased Demand for Plaintiff's Resources*

Plaintiff's third basis for injury is that defendant's source-of-income discrimination reduces the available stock of housing affordable to low-income New Yorkers thus "lead[s] to an increased demand and need for HRI's organizing, counseling and referral services." Am. Compl. ¶191. HRI rightly notes that "an organization can demonstrate injury where there is an increased need for the organization's services, thus imposing an involuntary burden on the organization's normal activities." Pl. Opp'n 14. (citing *Conn. Parents*, 8 F.4th at 174 & n.26).

HRI's Amended Complaint, however, neither qualitatively nor quantitively measures this increase in demand. *Cf. N.Y.S. Citizens' Coalition for Children v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019). Even without applying a heightened *Connecticut Parents* materiality standard for an increased-demand-for-services argument, the Court finds that HRI's Amended Complaint fails to establish injury-in-fact on these grounds. However, because the Court finds that HRI establishes injury on two independently viable bases—frustration of organizational mission and diversion of resources— defendants are unable to obtain dismissal of this Action on grounds that HRI lacks an injury.

### 2.  *HRI's Injuries are Traceable to the Challenged Conduct of Defendants*

The Court is satisfied that HRI has shown that its injuries are traceable to each of the defendants. First, all properties referenced in the complaint are residential real estate properties that are offered for rent in New York City and "monthly rent charged by Defendants at each of the Subject Properties did not exceed the Housing Choice Voucher Program's maximum allowable rents." Opp'n to Defs.' Mots. to Dismiss, at 4 (citing Am. Compl. ¶¶101, 103). HRI also pleads facts that each of the defendants who has moved to dismiss the complaint or moved for judgment on the pleadings has a policy of refusing to serve individuals who seek to pay for a rental unit through an HCV:

For example, Corcoran told HRI's fair housing tester that the last time someone tried to use a voucher at the building "the application was refused" and that the apartment "would [not] work for [her] needs." *Id.* ¶ 113. Similarly, Voro told HRI's fair housing tester that the landlord would not take a voucher. *Id.* ¶ 126. And 931-955 Coney Island Ave. told HRI's fair housing tester "We don't take that." *Id.* ¶ 137. The Manhattan Realty Group told HRI's fair housing tester "the owner is not going to accept it for this one in particular." *Id.* ¶ 135. FirstService Realty told HRI's fair housing tester that the voucher would not be accepted at Tenth Manhattan's building and that "they're pretty strict in this building." *Id.* ¶141. And Avenue Real Estate told the HRI tester that the "landlord will not accept section 8." *Id.* ¶ 152.

Opp'n to Defs.' Mots. to Dismiss 4.

Second, HRI has pleaded that *but for* source-of-income discrimination by the named defendants, HRI would be able to assist additional low-income New Yorkers in securing housing in affordable rental units owned or advertised by defendants and would not have had to engage in the investigation and campaign to combat source-of-income discrimination:

> Prior to and at the time of filing this action, Defendants' wrongdoing has injured, injures, and—if left unaddressed—will continue to injure HRI by frustrating its mission to promote fair housing opportunities and preserve and maintain affordable housing in New York City, and will require HRI to continue to divert its efforts and programming to combat practices that deny housing opportunities to voucher holders, preventing HRI from continuing its other counseling, organizing and referral efforts on behalf of tenants.

Am. Compl. ¶190.

### 3. *Redressability*

HRI has also adequately pleaded redressability. Viewing the harm retrospectively, plaintiff adequately pleads that it has been forced to incur significant expenses in combatting defendants' source-of-income discrimination, and that a court award of damages would redress some of this harm. Am. Compl. ¶62.

FirstService and Tenth Manhattan's joint memorandum argues that "because Plaintiff's alleged injuries are part of the organization's core activities, a favorable decision would not redress these purported injuries." FirstService Mem. 10. Yet as explained above, HRI's activities combatting source-of-income discrimination are a diversion from its regular activities of "counseling and organizing tenants in New York City about their rights to affordable housing and transparency by landlords, such as

rights guaranteed by rent-stabilization laws, tax reporting requirements and other laws." Am. Compl. ¶4.

Moreover, viewing the harm as ongoing and prospectively, plaintiff shows that injunctive relief under which defendants would no longer engage in source-of-income discrimination would "redress HRI's injury, as HRI's organizing, counseling and referral services aimed at maintaining and preserving affordable housing" will no longer be stymied by the inability of HCV holders to rent affordable apartments controlled or advertised by Defendants. Opp'n to Defs.' Mots. to Dismiss, at 7.

Redressability through an injunction against each defendant does not "guarantee" that an HCV voucher holder will ultimately move into every one of a defendant's available housing units that has rent at or below the HCV maximum threshold. However, because defendants' individual policies barring access to HCV recipients have "stood as an 'absolute barrier'" to the ability of HCV holders to move into the subject units, and housing markets are subject to a range of uncertainties, HRI had adequately shown redressability. *See Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 601 (2d Cir. 2016) (quoting *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 261 (1977)).

In sum, the Court finds that HRI has Article III standing to pursue its claims in federal court.

## IV. Disparate Impact Claim under the Fair Housing Act

Having found that HRI has Article III standing to pursue its claims, the Court now turns to defendants' arguments that HRI's Amended Complaint fails to state a claim under the FHA.

### A. Legal Standard

#### 1. Fed. R. Civ. P. 12(b)(6) Standard

"On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true." *York v. Ass'n of Bar of City of New York*, 286 F.3d 122, 125 (2d Cir. 2002). For such a motion, "the Court 'is limited to facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint by reference, as well as to matters of which judicial notice may be taken.'" *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 398 (S.D.N.Y. 2013) (quoting *Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.*, 155 F.3d 59, 67 (2d Cir. 1998)).

"What is required are 'enough facts to state a claim to relief that is plausible on its face.'" *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Moreover, "[a] claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662 (2009). In addition, the Second Circuit observes that a "choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion. '[F]act-specific question[s] cannot be resolved on the pleadings.'" *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 185 (2d Cir. 2012) (quoting *Todd v. Exxon Corp.,* 275 F.3d 191, 203 (2d Cir. 2001)).

### 2.  *Parties Authorized to Sue Under the FHA*

"Standing under the Fair Housing Act is as broad as Article III permits." *Mhany Mgmt., Inc. v. Cnty. of Nassau,* 819 U.S. 581, 600 (2d Cir. 2016) (citing *Havens Realty Corp.,* 455 U.S. at 372; *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington,* 316 F.3d 357, 362 (2d Cir. 2003)). *See also Hack v. President & Fellows of Yale Coll.,* 237 F.3d 81, 87 (2d Cir. 2000) (finding that standing under the FHA is broad and "extend[s] to the full limits of Art. III") (quoting *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 103 n.9 (1979)).

"[P]rivate persons are the primary method of obtaining compliance with the Act." *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972). Moreover, the FHA expressly contemplates that a person—defined to include corporations and associations, 42 U.S.C. § 3602(d)—is an "aggrieved person" able to bring an action for housing discrimination where the person "(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. §§ 3602(i), 3613(a)(1)(A).

In *Trafficante,* the Supreme Court considered a Fair Housing suit where plaintiffs were not themselves "objects of discriminatory housing practices" but sought relief as putative "aggrieved persons" as defined by the statute. 409 U.S. 205.[31] "The District Court did not reach the merits but only held that petitioners were not within the class of persons entitled to sue under the Act. The Court of Appeals affirmed, construing section 810(a) narrowly to permit complaints only by persons who are the objects of discriminatory housing practices." *Id.* at 208. The Supreme Court then reversed and remanded, finding that "[t]he language of the Act is broad and inclusive. Individual injury or injury in fact to petitioners, the ingredient found missing in *Sierra Club v. Morton,* is alleged here," *Id.* at 209, and that ""[t]he person on the landlord's blacklist is not the only victim of discriminatory housing practices; it is, . . . the whole community," *Id.* at 211. As the Supreme Court observed in *Trafficante,* the FHA contains a "private

---

[31] *Trafficante,* 409 U.S. at 208 ("The definition of 'person aggrieved' contained in s 810(a) is in terms broad, as it is defined as '[a]ny person who claims to have been injured by a discriminatory housing practice.'") (internal footnote omitted).

attorneys general" provision that is "not uncommon in modern legislative programs . . . [i]t serves an important role in this part of the Civil Rights Act of 1968 in protecting, not only those against whom a discrimination is directed but also those whose complaint is that the manner of managing a housing project affects the very quality of their daily lives." 409 U.S. 205, 211 (1972) (internal quotation marks and citations omitted).

The Supreme Court has subsequently indicated a broad view of injury-in-fact under the FHA. In *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 114 (1979), the Court approvingly cited *Shannon v. HUD*, 305 F. Supp. 205, 208, 211 (E.D. Pa. 1969), for the proposition that "residents in a neighborhood affected by urban renewal project have standing to challenge the project's impact on the neighborhood's racial balance." *Gladstone Realtors*, 441 U.S. at 114 n.28. The Court in *Gladstone Realtors* also approvingly cites to a law review comment arguing that the FHA has a private attorney general provision. *Id.* (citing Comment, The Fair Housing Act: Standing for the Private Attorney General, 12 Santa Clara Law. 562, 568–571 (1972)).

Accordingly, courts regularly find that organizations can seek relief under the FHA, even if the organization is not itself subject to discriminatory conduct. For examples of organizational standing related to suits averring discriminatory conduct against the disabled under 42 U.S.C. § 3604(f)(1), see *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014) (finding standing where a "complaint alleged that LIHS, as a not-for-profit corporation devoted to fair-housing advocacy and counseling, had expended resources in investigating and advocating on the Olsens' behalf"), and *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 402 (S.D.N.Y. 2013) (finding that the Fair Housing Justice Center and an individual defendant "adequately pled their disparate impact claims under at least two provisions of the FHA") (citing 42 U.S.C. §§ 3604(d), 3604(f)(1)).

### 3. *Entities Subject to the FHA*

Liability under the FHA is broad. As noted in *Connecticut Fair Housing Center v. Corelogic Rental Properties*, "Section 100.7 of the HUD regulations governs direct and vicarious liability for discriminatory housing practices. A person is directly liable for its own conduct that results in a discriminatory housing practice, its knowing failure to correct and end a discriminatory housing practice by that person's agent or employee and its knowing failure to correct and end a discriminatory housing practice by a third-party where the person had the power to correct it." 369 F. Supp. 3d 362, 372 (D. Conn. 2019) (citing 24 C.F.R. § 100.7(a)).

In addition, "[a] person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law." *Conn. Fair Housing Ctr.*, 369 F. Supp. 3d at 372. (citing 24

C.F.R. § 100.7(a)). *See Meyer v. Holley,* 537 U.S. 280, 285 (2003) ("[I]t is well established that the [Fair Housing] Act provides for vicarious liability."); *Cleveland v. Caplaw Enterprises,* 448 F.3d 518, 523 (2d Cir. 2006) ("Because Cleveland and Jackson have pled facts that could reasonably support a finding of control of LC Properties by Caplaw, it was error to dismiss the complaint at the pleadings stage for failure to allege agency.").

In addition, agents themselves may separately be held liable for an FHA violation. *Short v. Manhattan Apartments, Inc.,* 916 F. Supp. 2d 375, 399 (S.D.N.Y. 2012) ("[A]n agent is under no obligation to perform an unlawful act on behalf of the principal."); *Id.* ("It is well established that agents will be liable for their own unlawful conduct, even where their actions were at the behest of the principal.") (quoting *Jeanty v. McKey & Poague, Inc.,* 496 F.2d 1119, 1120–21 (7th Cir. 1974)).

### 4. *Disparate Impact Liability*

HRI only seeks relief under the FHA under a theory of disparate impact liability Plaintiff makes no argument for disparate treatment.[32] Thus, because HRI proceeds on a disparate impact theory, it has no burden—whether at the pleading stage or after discovery—to show that defendant intended to discriminate or even had knowledge that its actions would lead to a discriminatory outcome.[33] By contrast, under a disparate impact theory of liability, plaintiff can show simply that an allegedly wrongful act has had a discriminatory impact or is likely to have such a discriminatory impact.[34]

The disparate impact standard for FHA cases involves shifting burdens between plaintiff and defendants. In *Mhany Management, Inc. v. County of Nassau,* 819 F.3d 581, 600 (2d Cir. 2016), the Second Circuit held that the Department of Housing and Urban Development's 2013 regulation interpreting disparate-impact liability under the FHA superseded the traditional FHA disparate-impact liability test in the Second Circuit.[35]

---

[32] *Cf. L.C. v. LeFrak Org., Inc.,* 987 F. Supp. 2d 391, 400 (S.D.N.Y. 2013) ("[F]or disparate treatment cases, "[t]o establish a prima facie case of discrimination under the FHA [], the plaintiffs must present evidence that animus against the protected group was *a significant factor*" in the position taken by the defendant.") (quoting *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 49 (2d Cir. 2002)).

[33] Coney Island avers that HRI has an obligation to show that a "tester was told by a representative . . . that she could not rent an apartment because of a handicap," Coney Island Reply, at 9, but such a verbal discriminatory statement is not required for FHA relief. An overt discriminatory statement is not necessary for a disparate treatment theory of liability—where discriminatory intent can be shown through actions rather than words—nor under a disparate impact theory of liability. *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.,* 576 U.S. 519, 534 (2015).

[34] Contrary to FirstService and Tenth Manhattan's suggestion, a defendant or a defendant's agent does not need to "state or suggest" that there is "any sort of discriminatory policy underlying their facially neutral policies or the existence of any policies at all." FirstService Mem. 13.

[35] *Mhany Mgmt., Inc. v. Cnty. of Nassau,* 819 F.3d 581, 617 (2d Cir. 2016) ("In 2013, however, before the district court's decision was rendered, the Secretary of Housing and Urban Development ("HUD") issued a regulation interpreting disparate-impact liability under the FHA. . . . In addition to affirming disparate

Under the new framework, the court found that "the first two steps are substantially the same as in our case law" but that as a third step, the plaintiff has a new burden. *Mhany Mgmt.*, 819 F.3d at 617.

### a.   Step One: Plaintiff's Prima Facie Case

"First, a plaintiff or charging party must come forward with a prima facie case." *Mhany Mgmt.*, 819 F.3d at 617. "Under this test, a plaintiff must first establish a prima facie case by showing, '(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices.'" *Id.* (quoting *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 52-53 (2d Cir. 2002)). As explained in *Hack v. President & Fellows of Yale College*, a policy has a "discriminatory effect" when, although it was "adopted for neutral reasons [it] has a discriminatory impact on the availability of housing for [a protected group] or the terms and conditions on which the housing is offered." 237 F.3d 81, 88 (2d Cir. 2000). *See also Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir.) ("Under disparate impact analysis, . . . a prima facie case is established by showing that the challenged practice of the defendant actually or predictably results in racial discrimination; in other words that it has a discriminatory effect.") (internal citations omitted), *aff'd in part sub nom. Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15 (1988).

### i.   The Harm Can be "Predictable" Future Disparate Impact

Notably, a prima facie case may hinge on "actual" discrimination *or* conduct that "predictably results" in racial discrimination. *See Hack*, 237 F.3d at 90 ("A 'prima facie case is established by showing that the challenged practice of the defendant 'actually or predictably results in racial discrimination.'" (quoting *Huntington Branch, N.A.A.C.P.*, 844 F.2d at 934). In other words, an FHA disparate-impact prima facie case does not require concrete evidence that a discriminatory harm has *already* materialized and can be made out when challenged conduct would "predictably result[s]" in a discriminatory outcome.

---

impact liability as an element of the FHA, it outlined the ' [b]urdens of proof in discriminatory effects cases.' 24 C.F.R. § 100.500(c). . . . Instead of following HUD's framework, despite being well aware of HUD's regulation, the district court applied our traditional test.") (citing Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460 (Feb. 15, 2013) (codified at 24 C.F.R. Part 100)). *Mhany*, 819 F.3d at 619 *Id.* at 619 ("Our earlier burden-shifting approach applied in *Huntington Branch* and *Tsombanidis* may only survive if we previously held that our "construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982. Because we did not hold that the statute was unambiguous, *see Tsombanidis*, 352 F.3d at 575; *Huntington Branch*, 844 F.2d at 936, we are obliged to defer to the more recent HUD regulations.").

Courts routinely have found that plaintiffs make out a prima facie disparate-impact case when a defendant's challenged conduct is predicted to disparately impact FHA-protected groups by tending to make housing less available to that protected group in the *future*. For instance, the Second Circuit in *Mhany Management* "agree[d] with the district court's assessment that plaintiffs more than established a prima facie case" when the district court had found that "Garden City's rejection of R–M zoning in favor of R–T zoning had a significant disparate impact on minorities because it 'largely eliminated the potential for the type of housing that minorities were disproportionately likely to need—namely, affordable rental units.'") (internal citations omitted). 819 F.3d at 617, 620.[36]

    *ii.*   Disparate-Impact Liability May Attach to a Defendant's Single Decision

In addition, Second Circuit law establishes that even a one-off decision may constitute a policy or practice subject to disparate-impact challenge under the FHA.

> [W]e find no merit in Defendants' argument that the district court improperly allowed Plaintiffs to challenge a single, isolated zoning 'decision,' rather than a general zoning 'policy.' Garden City argues that disparate impact liability does not exist when a plaintiff challenges a defendant's one-off decision. Rather than challenging the Village's zoning ordinances in general, the Plaintiffs complain about a decision affecting one piece of property. We decline Defendants' invitation to draw a line defining what constitutes a 'one-off' zoning 'decision' as opposed to a zoning 'policy.' . . .

*Mhany*, 819 F.3d at 619. The *Mhany* panel reaches that holding, in part, through reliance on Title VII and ADEA disparate impact authority. *Id.* ("[I]n the Title VII and ADEA contexts, courts have permitted 'cases dealing with disparate impact challenges to single decisions of employers.' Indeed, other circuits have described the distinction between a single isolated decision and a practice as 'analytically unmanageable—almost any repeated course of conduct can be traced back to a single decision.'") (quoting *Council 31, Am. Fed'n of State, Cty. & Mun. Emps., AFL–CIO v. Ward*, 978 F.2d 373, 377

---

[36] *See also Mhany Mgmt.*, 819 F.3d at 617 ("Here, the district court concluded that 'the R–T zone's restriction on the development of multi-family housing perpetuates segregation generally because it decreases the availability of housing to minorities in a municipality where minorities constitute approximately only 4.1% of the overall population . . . and only 2.6% of the population living in households.' . . . [W]e agree with the district court's assessment that plaintiffs more than established a prima facie case.").

(7th Cir.1992); *Mhany*, 819 F.3d at 619 (citing *Nolting v. Yellow Freight Sys., Inc.*, 799 F.2d 1192, 1194 (8th Cir.1986)).

  iii. Defendant's Conduct May Make Housing "Otherwise Unavailable" to a Protected Group even Where No Application for Housing is Submitted

Under 42 U.S.C. § 3604(a), "it shall be unlawful—(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." A statement by a property owner or owner's representative that a prospective tenant would be unable to use a HCV to rent a specific unit is adequate to establish that the property owner or owner's agent has "refuse[d] to negotiate for the . . . rental of, or otherwise ma[d]e unavailable or den[ied], a dwelling to any person." 42 U.S.C. § 3604(a). HUD's implementation regulations, moreover, define that what it means "to otherwise make unavailable or deny" a dwelling as including conduct that is "[d]iscouraging any person from inspecting, purchasing or renting a dwelling" (24 C.F.R. § 100.70(c)(1)), or that is "[d]enying or delaying the processing of an application made by a . . . renter," *id.* § 100.70(d)(3)).

FirstService and Tenth Manhattan latch on to the "bona fide offer" text of the statute to suggest that a plaintiff cannot obtain relief under Section 3604(a) if there is no bona fide offer made. But as HRI correctly notes, the "bona fide offer" requirement grammatically only applies to "refusals to rent [or sell], and not to the remainder of the prohibition [of 42 U.S.C. 3604(a)³⁷]" Pl. Opp'n to Mots. to Dismiss 32 (quoting *Fair Hous. Just. Ctr., Inc. v. Silver Beach Gardens Corp.*, No. 10 CIV. 912 RPP, 2010 WL 3341907, at *5 (S.D.N.Y. Aug. 13, 2010).³⁸ Coney Island Avenue's proposed standard that a plaintiff needs to have completed a full application to demonstrate a denial of housing lacks merit. *See also L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 399 (S.D.N.Y. 2013).

Accordingly, the bona fide offer requirement only applies to refusals to sell or rent and does *not* apply to "refus[als] to negotiate for the sale or rental of, or *otherwise make unavailable* or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a) (emphasis added).³⁹

---

³⁷ 42 U.S.C. § 3604(a) ("To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.").

³⁸ *See Silver Beach Gardens Corp.*, 2010 WL 3341907, at *5 ("The ban on refusals to sell or rent on the basis or race, etc. is the only clause of [§ 3604(a)] that includes the bona fide offer requirement. Consequently, the other activities addressed by subsection (a) ... are prohibited irrespective of whether there was a bona fide offer") (quoting *Kyles v. J.K. Guardian Security Servs. .*, 222 F.3d 289, 300 n. 7 (7th Cir. 2000)).

³⁹ *Silver Beach Gardens Corp.*, 2010 WL 3341907, at *6.

This textual reading is consistent with Second Circuit jurisprudence that does not impose a bona fide offer requirement when a defendant is alleged to "refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). For instance, the Second Circuit in *United States v. Yonkers Board of Education* found liability under 42 U.S.C. § 3604(a) in the absence of any refusal of a bona fide offer to rent or sell. *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1219 (2d Cir. 1987).

### iv.  Plaintiff Need Not Show Defendants' Impact on Segregation Patterns

FHA disparate-impact claims may, but need not, allege that a defendant's conduct has caused, or is predicted to cause, segregated housing patterns.[40] Although defendants policies to refuse to rent to HCV holders may in fact worsen housing segregation patterns and plaintiff includes some language indicating that defendants' conduct worsens segregation in New York City (*see* Am. Compl. ¶94) such a potential causal relationship need not be analyzed to reach the merits of whether plaintiff could—after discovery—meet its prima facie burden of showing that each defendant's policy of refusing to accept HCV either "caused or predictably will cause a discriminatory effect" on disabled, Black, and Hispanic New Yorkers. *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 527 (2015) (quoting 24 CFR § 100.500(c)(1) (2014)).

Accordingly, because the Court need not analyze whether defendants' policies "worsen[] housing segregation" in New York City, Am. Compl., at 2, the Court need not set forth the legal standard for disparate-impact claims that hinge on proving that a defendant's policy impacted segregation patterns.

---

[N]one of the testers in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898 (2d Cir.1993) or *Cabrera v. Jakabovitz*, 24 F.3d 372, 379 (2d Cir. 1994) even submitted an application for housing. The courts granted injunctive relief and damages for the organizational claimants in those cases, despite the fact that the plaintiffs never applied for housing. The lack of an application by the testers does not bar Plaintiff FHJC's claim of a violation under the second clause of 42 U.S.C. § 3604(a).

*Id.*

[40] *See, e.g., Mhany Mgmt.*, 819 F.3d at 619-20 ("Plaintiffs also note that there are two methods of proving the discriminatory effect of a zoning ordinance: (1) 'adverse impact on a particular minority group,' and (2) 'harm to the community generally by the perpetuation of segregation.'") (quoting *Huntington Branch*, 844 F.2d at 937)).

b. *Step Two: Defendant's Burden to Show that the Challenged Practice is Necessary for Substantial, Legitimate, Nondiscriminatory Interests*

Step two of the disparate-impact inquiry places the burden on the defendant. If "a plaintiff does establish a prima facie showing of disparate impact, the burden shifts to the defendant to 'prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.'" *Inclusive Communities Project, Inc.*, 576 U.S. at 527 (quoting 24 CFR § 100.500(c)(2)). *See also Mhany Mgmt.*, 819 F.3d at 617 (quoting 24 C.F.R. § 100.500(c)(1)–(2)) (same). As noted by the *Inclusive Communities Project* Court, "this step of the analysis 'is analogous to the Title VII requirement that an employer's interest in an employment practice with a disparate impact be job related.'" *Id.* (quoting 78 Fed. Reg. 11470).

Because this Opinion & Order only addresses motions to dismiss and motions for judgment on the pleadings, and no defendant has yet had an opportunity to introduce evidence into the record, it is premature for the Court to entertain an inquiry on whether any defendant could prevail on its step two burden. *Cf. Mhany Mgmt.*, 819 F.3d at 620 (agreeing with the district court's analysis that defendants, during a bench trial, met their step two burden having "identified legitimate bona fide governmental interests, such as increased traffic and strain on public schools"). At the pleading stage, the Court does not assess whether defendants may have adequate justification for employing an HCV ban.

c. *Step Three: Plaintiff's Burden to Show Defendant's Interests Could be Served through Different Practice with Less Discriminatory Impact*

Third, "if the defendant meets its burden, the burden of proof shifts back to the plaintiff to show that the 'substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.'" *Mhany*, 819 F.3d at 617 (quoting 24 C.F.R. § 100.500(c)(3)). As noted by the Second Circuit, "[t]he Supreme Court implicitly adopted HUD's approach, [] stating that before rejecting a business or public interest, 'a court must determine that a plaintiff has shown that there is an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs.'" *Mhany Mgmt.*, 819 F.3d at 618 (citing *Inclusive Communities Project, Inc.*, 576 U.S. at 533).

For the reasons set forth regarding step two above, the Court need not at this stage set forth the legal standard for determining whether plaintiff can carry its burden on step three of the FHA disparate-impact inquiry.

### 5. *Plaintiff's Burden on Disparate-Impact Test at the Pleading Stage*

Having set forth the disparate-impact standard above, the Court now clarifies that HRI need not prove a prima facie case to avoid Fed. R. Civ. P. 12(b)(6) dismissal for

failure to state a claim. "The prima facie case for showing discrimination is an evidentiary standard, not a pleading requirement . . . " *Winfield v. City of New York*, No. 15CV5236-LTS-DCF, 2016 WL 6208564, at *5 (S.D.N.Y. Oct. 24, 2016) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 516 (2002)). Accordingly, "at the pleading stage, [p]laintiffs are merely required to plausibly plead disparate impact; they are not required to prove causation or disparate impact through statistical evidence at the pleading stage." *Washington v. United States Dep't of Hous. & Urb. Dev.*, No. 16CV3948ENVSMG, 2019 WL 5694102, at *21 (E.D.N.Y. July 29, 2019) (citing *Winfield*, 2016 WL 6208564, at *6).

Judge Denise L. Cote's opinion in *L.C. v. LeFrak Organization* offers one such illustration. 987 F. Supp. 2d 391, 402. (S.D.N.Y. 2013). There, Judge Cote found that plaintiffs adequately "pled their disparate impact claims" under Sections 3604(d) (not at issue here) and 3604(f)(1): plaintiffs "alleged that LeFrak has a facially neutral policy regarding applicants who are recipients of housing subsidies, and that those policies cause individuals within a protected group to be provided with limited information and to face a more burdensome rental process" and plaintiffs "also sufficiently alleged that the portion of the affected population with a disability, HIV, is disproportionate." *Id.* (citing 42 U.S.C. §§ 3604(d), 3604(f)(1)). She proceeded to reject defendants' arguments that "plaintiffs failed to plead a disparity in outcome for HIV individuals between the group affected by LeFrak's policy and the group unaffected," noting that "defendants cite various district court cases stating that plaintiffs must plead a statistical disparity, the underlying precedent cited in virtually all of these cases, *Tsombanidis*, 352 F.3d at 572, involved a summary judgment motion and a trial, not a motion to dismiss." *LeFrak Org.*, 987 F. Supp. 2d at 402.

After considering the *Iqbal* pleading standards, *id.* at 398, and observing that "it is reasonable to expect that plaintiffs pleading disparate impact claims must include at least one allegation that raises an inference of such disparity—one sufficient to put the defendants on notice regarding the basis for plaintiffs' belief in a disparate effect," the Court found that plaintiffs met their burden to survive a motion to dismiss:

> The Amended Complaint states that, as of 2010, New York City had a population of approximately eight million individuals, the HIV population in New York City was approximately 67,000 people, 49% of which are HASA clients, the "vast majority" of which utilize a HASA housing subsidy. This adequately puts defendants on notice that plaintiffs' alleged basis for disparate impact is that the percentage of the HIV population in New York City on housing subsidies exceeds the percentage of the non-HIV New York City population on housing subsidies.

*LeFrak Org.*, 987 F. Supp. 2d at 402-03. Judge Cote's conclusion in *LeFrak* is echoed by other Second Circuit courts to evaluate FHA disparate impact claims.

### B. Analysis

#### 1. *HRI is an Aggrieved Person Under the FHA*

First, the Court finds that HRI is an aggrieved person such that it may sue under the FHA. Contrary to Coney Island Avenue's suggestion, a plaintiff need not itself be a member of a protected class for relief under the FHA. Rather, "the FHA provides a right of action for an 'aggrieved person,' 42 U.S.C. § 3613(a)(1)(A), which is defined to include 'any person who . . . claims to have been injured by a discriminatory housing practice,'" *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014) (quoting 42 U.S.C. § 3602(i)(1)). "This FHA definition of 'aggrieved person' extends 'as broadly as is permitted by Article III of the Constitution.'" *Olsen*, 759 F.3d at 158 (quoting *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 209 (1972)).

#### 2. *Defendants Are Subject to the FHA*

Because, as alleged in the Amended Complaint, all defendants are landlords and brokers, and landlords and their brokers can be held liable under the FHA, *see supra* Section IV.A.3, HRI can reasonably sue these defendants under the FHA. Contrary to FirstService and Tenth Manhattan's suggestion,[41] at the pleading stage, a property owner or broker cannot obtain dismissal of a claim by arguing that a rogue agent's discriminatory conduct is attributable to the property or broker. *See supra* Section IV.A.3.

#### 3. *Sufficiency of HRI's Disparate Impact Pleading*

Corcoran, citing to *Weisenberg v. Town Bd. of Shelter Island*, 404 F. Supp. 3d 720, 726 (E.D.N.Y. 2019), observes that in the FHA disparate impact context, "courts have found that a complaint is plausible on its face, 'when the alleged facts allow the court to draw reasonable inference of a defendant's liability for the alleged misconduct' requiring more than a 'sheer possibility' of a defendant's liability." Corcoran Mem. 9. The Court can draw such reasonable inferences of each defendant's liability from the Amended Complaint for the reasons set forth below.

##### a. *Facially Neutral Practice*

At the pleading stage, HRI needs to allege sufficient factual support to make it plausible that each defendant has "certain outwardly neutral practices." *Mhany Mgmt.*, 819 F.3d at 617 (citing *City of Middletown*, 294 F.3d at 52–53).

HRI adequately pleads that each defendant has a policy to preclude HCV holders from renting at the "Subject Properties," as HRI alleges that "[d]efendants illegally

---

[41] FirstService Mem. 13 ("Plaintiff provides no explanation for how one FirstService representative is able to speak for FirstService's and Tenth Manhattan's practices or policies as a whole.")

discriminated against individuals with disabilities by *making unavailable or denying apartments* for rent because of disability, including, but not limited to, refusing to: (a) provide information about apartments available for rent; (b) show apartments available for rent; (c) consider applications from individuals using Housing Choice Vouchers." Am. Compl. ¶196 (emphasis added).

As to factual matter, HRI avers that its testers contacted *each* named defendant (or the property owner's broker to which the property owner had an agency relationship) and that each named defendant has a policy to prohibit HCV holders from living in the Subject Properties. Specifically, HRI provides factual accounts of the HRI testers' inquiries to the defendants about renting the Subject Properties with use of an HCV. *See* Am. Compl. ¶¶111-153.

Some defendants claim that HRI has not met its burden here, but their arguments are either faulty or not appropriate to consider at the motion to dismiss stage and may instead be raised and substantiated by such defendants at a motion for summary judgment stage. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) ("The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to "sho[w] that the pleader is entitled to relief.").

One such faulty argument comes from Manhattan Realty Group's contention that HRI's documented February 25, 2020 tester call "is insufficient to establish a 'policy' of not accepting Section 8 vouchers in the first place," Manhattan Realty Group Mem. 2, because it sets forth an improper standard at this motion to dismiss stage. HRI need only offer sufficient factual support showing that such a policy is plausible, which HRI has done: (i) "At all times relevant to this Complaint, the monthly rent charged by Defendants at each of the Subject Properties did not exceed the Housing Choice Voucher Program's maximum allowable rents." Am. Compl. ¶103, (ii) HRI provides a factual account of a Manhattan Realty broker stating that HCVs are not accepted at a unit at 316 East 62nd Street #5RE, *id.* ¶135, and (iii) HRI pleads that "Upon information and belief, and based on the statements Defendants and their representatives made to HRI testers during the calls described above, Defendants have policies or practices of refusing to accept Housing Choice Vouchers at the Subject Properties, which Defendants are the brokers for, own, or manage." *Id.* ¶155.

Moreover, HRI need not plead that Manhattan Realty Group prohibits HCV use in *all* the housing units it controls. If this defendant instead had an express policy against leasing one or more units to Hispanics, and the defendant had instead said "we do accept [them], but not for this apartment, the owner is not going to accept [them] for this one in particular," Manhattan Realty Reply 2, the Court could readily conclude that defendant had a policy for at least some of its housing of refusing to lease to Hispanics.

83rd Street Associates LLC contends that the actions of Jan Reynolds Real Estate, a broker, cannot be attributed to it because there was no agency relationship between it

and Jan Reynolds. 83rd Street Associates submits declarations and exhibits to support its position. The Court will not consider those materials on a motion to dismiss.

    *b.   The Policy Has a Disparate Impact on Protected Groups*

For the second part of HRI's burden at this pleading stage, HRI needs to allege sufficient factual support to make it plausible that the facially neutral practice outlined above—to prohibit HCV holders at the Subject Properties—has "a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Mhany Mgmt.*, 819 F.3d at 617 (citing *City of Middletown*, 294 F.3d at 52–53).

Because among New York City residents, HCV holders are far more likely to be disabled, Black, and Hispanic than the population as a whole, a landlord or broker's policy to refuse housing to HCV holders will have the impact of keeping that real estate actor's housing disproportionally *less* Black, disproportionally *less* Hispanic, and disproportionally *less* disabled than such housing would be if the landlord accepted tenants with HCVs.

Contrary to Coney Island's statement that "HRI asks this Court to simply assume that the person who was seeking housing must have been Black, Hispanic or a disabled person," Coney Island Mem. 21, HRI never makes such an argument. Rather, HRI's argument is that barring HCV holders from renting apartments will have the impact of tending to exclude far more disabled, Black, and Hispanic individuals than other individuals. Consequently, for instance, Coney Island's policy or practice of excluding HCV holders would—all else held constant—have the discriminatory impact of reducing the share of its housing lived in by disabled, Black, and Hispanic people.

    i.   Disabled Individuals

To the extent that each defendant has a policy that has, does, and will continue to ban HCV holders from housing units, HRI adequately pleads that such a policy has, does, and will continue to have a disparate impact on disabled individuals, who are protected under the FHA.

First, HRI explains that New York City's HCV holders are far more likely to be disabled than the non-HCV holder population of the City. Am. Compl. ¶88.

Next, HRI explains that:

> By denying all New Yorkers with Housing Choice Vouchers the opportunity to apply for and obtain housing in their buildings, each Defendant's policy prevents 9.2% of New York City's disabled population from applying for or obtaining housing in Defendants' buildings, while preventing just 2.8% of New York City's non-disabled population from applying for or obtaining housing in their buildings.

*Id.* ¶162. HRI also frames the statistical impact in a different way by explaining that "[d]isabled New York City residents are 3.3 times more likely than non-disabled New York City residents to be adversely affected by Defendants' policies." *Id.*

HRI's Amended Complaint is adequate at the pleading stage to show that defendants' practices have had, are having, and are predictably expected to have a disparate impact on disabled New York City residents.

Contrary to Coney Island LLC's assertion that "HRI fails to allege the bare minimum of what is required to assert a disparate impact claim: the number of individuals, by protected category, who applied for, and were excluded from, housing" Coney Island Mem. 21, a plaintiff need not provide at the pleading stage the precise number of individuals or even an estimate of those who have been adversely affected or who are at risk of being adversely affected by challenged conduct. Second Circuit law makes clear that disparate impact claimants need not submit all conceivable quantitative evidence as an attachment to their complaint. *See Mhany Mgmt.*, 819 F.3d at 597–98 (2d Cir. 2016). Moreover, Coney Island's citations to *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 91 (2d Cir. 2000), and *Ungar v. New York City Housing Authority*, is inapt. 363 F. App'x 53, 56 (2d Cir. 2010) (summary order), are inapt.[42]

Further, HRI's proffered statistics support a claim that defendants' policies prohibiting HCV holder use will continue to disparately impact disabled New York City residents. At least at this pleading stage, HRI has adequately alleged facts that plausibly indicate that an HCV ban "predictably results" in discrimination. *See Hack*, 237 F.3d at 90.

---

[42] Unlike in *Hack*, where the court found that "[t]he students do not allege that Yale's policy has resulted in or predictably will result in under-representation of Orthodox Jews in Yale housing," HRI pleads that defendants conduct has resulted in or predictably will result in underrepresentation of disabled, Black, and Hispanic individuals in defendants' housing. *See* Am. Compl. ¶197 ("Defendants' policy or practice or refusing to accept Housing Choice Vouchers towards rent at the Subject Properties has a discriminatory effect on disabled individuals because it actually or predictably results in a disparate impact on disabled individuals."); Am. Compl. ¶206 ("Defendants' policy or practice or refusing to accept Housing Choice Vouchers towards rent at the Subject Properties has a discriminatory effect on African Americans and Hispanic Americans because it actually or predictably results in a disparate impact on them.").

 *Ungar v. New York City Housing Authority* is likewise unhelpful. 363 F. App'x 53, 56 (2d Cir. 2010) (summary order). First, *Ungar* was a summary order and thus nonprecedential. Second, the *Ungar* finding against FHA plaintiffs occurred at summary judgment, not at the pleading stage. Thus, the *Ungar* plaintiffs had the opportunity to engage in discovery prior to the court's adverse finding against them.

Thus, HRI's Amended Complaint is adequate at the pleading stage to show that each of the defendants (i) has a practice of barring HCV holders from its housing units and (ii) that this practice has had, is having, and is predictably expected to have a disparate impact on disabled New York City residents—by disproportionately denying them access to housing relative to non-disabled New York City residents—in violation of 42 U.S. § 3604(f).

ii.   Black and Hispanic Individuals

To the extent that each defendant has a policy that has, does, and will continue to ban HCV holders from housing units, HRI adequately pleads that such a policy has, does, and will continue to have a disparate impact on Black and Hispanic individuals, who are protected under the FHA.

First, HRI explains that New York City's HCV holders are far more likely to be Black and Hispanic than the non-HCV holder population of the City. Am. Compl. ¶167 ("Some 35% of New York City's voucher-holders are Black, and 47% are Hispanic" while "just 21% of New York City's general, non-voucher population is Black, 29% New York City's, non-voucher population is Hispanic").

Next, HRI explains that:

> Defendants' ban on Housing Choice Vouchers, by denying all New Yorkers with vouchers the opportunity to apply for and obtain housing in their buildings, prevents 5.5% of all Black New York City residents from securing housing in Defendants' buildings, and 5.5% of all Hispanic New York City residents from securing housing, while only preventing 1.7% of white New Yorkers from obtaining housing.

*Id.* ¶166. HRI also frames the statistical impact in a different way by explaining that " Black and Hispanic New York City residents are 3.2 times more likely than white New York City residents to be adversely affected by Defendant's policy." *Id.*

Moreover, HRI also quantifies the number of Black and Hispanic New York City residents adversely impacted. *Id.* ¶165 ("[A]about 100,600 Black New York City residents, or 5.5% of all Black New Yorkers, rely on a Housing Choice Voucher for housing, and 135,140 Hispanic New York City residents, or 5.5% of all Hispanic New Yorkers, rely on a Housing Choice Voucher for housing. By comparison, just 46,006 white New York City residents, or 1.7% of all white New York City residents, use a Housing Choice Voucher to obtain housing.").

For substantially the same reasons set forth in the immediately preceding discussion on disabled individuals, HRI's Amended Complaint is adequate at the pleading stage to show that each of the defendants (i) has a practice of barring HCV holders from its housing units and (ii) that this practice has had, is having, and is predictably expected to have a disparate impact on Black and Hispanic New York City residents—by

disproportionately denying them access to housing relative to non-Black and non-Hispanic New York City residents—in violation of 42 U.S. § 3604(a).

### 4. *Individualized Pleading*

Having found that HRI has adequately pleaded disparate impact claims against each defendant, the Court now explains why it finds the Amended Complaint's allegations against each of the defendants to be sufficiently individualized.

Several defendants contend that HRI's claims are not sufficiently individualized, but at the pleading stage the Amended Complaint is adequate to permit a strong inference (i) that *each* defendant has a policy or practice of barring HCVs and (ii) that *each* defendant's policy has a disparate impact on protected groups or is predicted to have a disparate impact on them.[43] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that a complaint must "give the defendant fair notice" of what the plaintiff's claim is "and the grounds upon which it rests."); *Soter Techs., LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 411 (S.D.N.Y. 2021) ("Where a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each of the defendants."). *Cf. Atuahene v. City of Hartford*, 10 Fed. App'x 33, 34 (2d Cir. 2001).

Because HRI has pleaded that several defendants have an identical policy or practice to refuse tenants with an HCV, HRI can refer to such defendants collectively in other portions of the Amended Complaint. *See, e.g., In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 471 (S.D.N.Y. 2005) ("Rule 8 does not require Plaintiffs to identify each of the eighteen Defendants by name each time the Complaint makes an allegation that applies equally to all."); *Vantone Grp. Liab. Co. v. Yangpu NGT Indus. Co.*, No. 13CV7639-LTS-MHD, 2015 WL 4040882, at *3 (S.D.N.Y. July 2, 2015) ("[C]ourts within this Circuit have held that '[n]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant.'") (quoting *Hudak v. Berkley Group, Inc.*, No. 13CV0089-WWE, 2014 WL 354676, at *4 (D. Conn., Jan. 23, 2014)). For instance, HRI can seek identical injunctive relief from each defendant that prohibits use of HCVs without needing to individually restate the names of each defendant. In addition, HRI has no obligation to separately allege each of its diversion of resources with respect to each defendant.

One final point on individualized pleading merits attention. Some defendants argue that HRI also needs to allege specific damages against each defendant. FirstService Realty avers that "Plaintiff has neither alleged nor even attempted to allege actual damages. The matter is not a class action; rather, it is a plaintiff suing many disparate defendants. Plaintiff has an obligation to allege actual damages as to each and

---

[43] For facts pleaded against Coney Island, see Am. Compl. ¶137. For facts pleaded against FirstService Realty (broker and agent for Tenth Manhattan), see Am. Compl. ¶141.

every defendant." FirstService Mem. 2. Corcoran echoes this view: "HRI's Amended Complaint asserts claims against nearly eighty separate entities. Plaintiff does not distinguish its alleged expenditure of resources between any of the defendants." Corcoran Mem. 15 citing (*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021)). These arguments are not adequate for the Court to dismiss HRI's disparate impact claims. Damages will be determined at trial.[44] Moreover, even if HRI's claims for damages were deficient, its disparate impact claims could proceed at this stage because plaintiff seeks injunctive relief against each defendant.

## V.  Supplemental Jurisdiction over Non-FHA Claims

Because the Court denies defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss HRI's two federal claims against each of the defendants, the Court maintains the HRI's state-law claims pursuant to 28 U.S. Code § 1367.[45]

## VI. Conclusion

For the reasons set forth above, each of the motions to dismiss filed by Voro LLC, Corcoran Group LLC, Saldo Properties, LLC, Manhattan Realty Group, 931-955 Coney Island Ave. LLC, Avenue Real Estate LLC, FirstService Realty NYC, Inc. and Tenth Manhattan Corp., 83rd Street Associates LLC, JRL-NYC, LLC and East 34th Street, LLC are denied, as is the motion for judgment on the pleadings filed by GIM Realty LLC., and the joint motion to dismiss and motion for judgment on the pleadings filed by 3Location3.Co Realty LLC and 469 Clinton Ave Realty LLC.


Dated:  New York, New York
February 14, 2023


SO ORDERED:

Sidney H. Stein, U.S.D.J.

---

[44] *See, e.g., Alevsky v. GC Servs. Ltd. P'ship*, No. 13-CV-6793 JG, 2014 WL 1711682, at *1 (E.D.N.Y. Apr. 30, 2014) (citing 5 Wright & Miller, *Federal Practice and Procedure: Civil* § 1255 (3d ed. 2004)).

[45] Voro's sole argument for dismissal of the non-FHA claims as that such claims should not be maintained in this action if all of the federal claims are dismissed. Voro Mem. 5. *See also* Coney Island Mem. 23 (same).

## Appendix

| Motion | Movant | Mem. | Pl. Resp. | Reply |
|---|---|---|---|---|
| ECF No. 305 Mot. to Dismiss | Voro LLC | ECF No. 365 ("Voro Mem.") | ECF No. 393 ("Opp'n to Defs.' Mots. to Dismiss") | ECF No. 442 ("Voro Reply") |
| ECF No. 312 Mot. to Dismiss | Corcoran Group LLC | ECF No. 314 ("Corcoran Mem.) | ECF No. 393 ("Opp'n to Defs.' Mots. to Dismiss") | ECF No. 431 ("Corcoran Reply") |
| ECF No. 323 Mot. to Dismiss | Saldo Properties, LLC | ECF No. 323-4 ("Saldo Mem.") | ECF No. 394 ("Opp'n to Saldo Mot. to Dismiss") | ECF No. 413 ("Saldo Reply") |
| ECF No. 329 Mot. to Dismiss | Manhattan Realty Group | N/A[46] | ECF No. 393 ("Opp'n to Defs.' Mots. to Dismiss") | ECF No. 423 ("Manhattan Realty Reply") |
| ECF No. 358 Mot. to Dismiss | 931-955 Coney Island Ave. LLC | ECF No. 360 ("Coney Island Mem.") | ECF No. 393 ("Opp'n to Defs.' Mots. to Dismiss") | ECF No. 399 ("Coney Island Reply") |
| ECF No. 363 Mot. to Dismiss | Avenue Real Estate LLC | N/A[47] | ECF No. 393 ("Opp'n to Defs.' Mots. to Dismiss) | N/A |
| ECF No. 371 Mot. to Dismiss | FirstService Realty NYC, Inc. and Tenth Manhattan Corp. | ECF No. 372 ("FirstService Mem.") | ECF No. 393 ("Opp'n to Defs.' Mots. to Dismiss) | ECF No. 421 ("FirstService Reply") |
| ECF No. 401 Mot. to Dismiss | 83rd Street Associates LLC. | ECF No. 402 ("83rd Street Mem.") | ECF No. 395 ("Opp'n to 83rd Street Associates Mot. to Dismiss") | 424 Reply ("83rd Street Reply") |
| ECF No. 428 Mot. for J. on the Pleadings | GIM Realty LLC | ECF No. 430 ("GIM Mem.") | ECF No. 433 ("Opp'n to GIM Mot. for J. on the Pleadings") | 438 Reply ("GIM Reply") |
| ECF No. 568 Mot. to Dismiss | JRL-NYC, LLC and East 34th Street, LLC | N/A[48] | ECF No. 393 ("Opp'n to Defs.' Mots. to Dismiss) | N/A |
| ECF No. 573 Mot. to Dismiss | 3Location3.co 469 Clinton Ave. Realty | N/A | ECF No. 574 | N/A |

[46] ECF No. 329-1 (Manhattan Realty Group joining the motions of co-defendants Corcoran and Saldo).
[47] ECF No. 363 (Avenue Real Estate LLC joining in Corcoran Group LLC's motion and adopting Corcoran's legal arguments).
[48] ECF No. 568 (solely relying on Corcoran's fully submitted and pending motion to dismiss).